**KAREN J.M. Petitioner,**

v.

**JAMES W. Respondent.**

No. CN95–06522.

Family Court of Delaware.

Submitted: Aug. 24, 2001.
Decision: Nov. 29, 2001.
Revised: Jan. 3, 2002.

Timothy Hitchings, Esquire, Bear, attorney for Petitioner.

H. Alfred Tarrant, Jr., Esquire, Cooch and Taylor, Wilmington, attorney for Respondent.

WASERSTEIN, J.

Before the Court are Karen J.M. (Mother), her attorney Timothy L. Hitchings, Esquire, James W. (Father) and his attorney H. Alfred Tarrant, Jr., Esquire on Mother's Rule to Show Cause (RTSC) petition, her Petition for Visitation and the parties' Cross–Custody Petitions regarding their child, Nicole W. d.o.b. 10/18/88. Basically, Mother alleges that Father has interfered in her relationship with the child in that he has not encouraged a positive interaction between them nor permitted Mother telephone access to the child. Mother also alleges that Father was not cooperative in the counseling process, which Father vehemently denies.

Father, on the other hand, alleges that the child is happy and does not desire a relationship with Mother. As explained by Father, the child suffered when she witnessed domestic violence in Mother's home during a prior visit in January 1995 and does not wish to see Mother. Moreover, Mother and child did not even have contact for months prior to the filing of Mother's Petition for Visitation on March 14, 2000.

In addition to testimony from the parties, the Court heard testimony from: (a) Natalie H., the child's therapist; (b) Colleen M., Mother's sister; (c) Reverend Peter E., a teacher and minister who attempted to provide counseling and mediation services to the entire family; (d) Father's current wife, Susan; and (e) Pamela D., coordinator of the Visitation Center where both supervised visits and exchanges have taken place. The Court interviewed the child on the record twice, almost six months apart.

## PROCEDURAL HISTORY

Several prior orders were issued by this Court beginning on January 8, 2001 which established a gradually increasing schedule of contact between Mother and daughter. The contact started with supervised visits at the Visitation Center, and eventually moved to exchanges at the Center. At first, the exchanges were for short visits, lasting one or two hours and eventually built up to overnight exchanges which the Court understands started on September 29, 2001 and continued on alternating Saturdays thereafter. The Court also ordered that Mother and child counsel at Starting Point, Westmont, New Jersey and that the child continue individual counseling with Natalie H., the therapist at SOAR who has won the child's trust.

In a seven page Amended Order dated August 24, 2001, the Court specified the visitation schedule, including a schedule in the event that Father and his family relocate to Florida. The purpose of this disposition is to decide the pending RTSC and to describe the factual background which is the basis for the Court's August 24th Order.

## RULE TO SHOW CAUSE

■ On Mother's RTSC Petition, the Court finds that Father violated the prior Order which mandated telephone contact on Tuesday and Thursday nights at 7:00 p.m. because he did not take affirmative steps to request that the Court eliminate that provision of the Order. Instead, he relied on the fact that Mother did not call regularly and according to him, since Nicole did not, in his view, want to speak to her, he did not ensure that Nicole was

available at those times. Mother, however, documented thirty times when she called at the designated times between June 8, 2000 and December 21, 2000 with no success. Although she left messages eighteen times, there was no return phone call and, on three other occasions, Susan told Mother that Nicole did not want to talk. Mother also called unsuccessfully on December 23, 2000 but that was not a Tuesday or a Thursday.

Moreover, Father did not do enough to provide Mother with sufficient information regarding the child's activities and medical care over a period of time, other than the counseling from Natalie H. Father, however, is not in contempt of Court in respect to his obligation to cooperate with counseling. Although Mother requested the counseling with Reverend E., she is also the one who discontinued it despite Father's cooperation.

■ Although Father is in contempt in one important aspect of the prior Order, the Court will not issue sanctions against him at this time. The question of sanctions is reserved in the event that future hearings are needed in this case. If no future hearings are necessary, the Court shall award no sanctions for the telephone contact violations. The Court believes that this family has had enough dissension and that it is more important, at this point, to move forward with the provisions of the August 24, 2001 Order which are intended to facilitate Mother and daughter rebuilding their relationship in the context of the daughter continuing to live with Father and his current family.

### DISRUPTION OF VISITATION AND THE CHILD'S FEARS

Nicole's primary residency has always been with Father. Although the parties had allegedly amicably agreed on visitation arrangements until approximately January of 1995, Mother's last visitation with the child was on January 8, 1995. At that time, Father terminated visitation because Glenn M.M., Mother's significant other and a violent person whom the child feared, continued in a relationship with Mother.

According to Natalie H., the child's therapist, there was not just one domestic violence incident that traumatized the child. As the child reported to Ms. Harris, who started treating the child approximately five years later, there were a series of incidents when the child visited with Mother. The incidents involved Mother and her boyfriend but the violence was never directed at the child. Nevertheless, there was a lot of breaking of glass, violence, yelling and a lot of fighting between the two adults.

In the Court's view, Father responded appropriately in January 1995 and, in fact, both he and Susan Williams took Mother with them to their home when they picked up Nicole from Mother's home at the end of the visit. They offered Mother help and support at the time.

After visitation stopped, Mother came to Father's home with the police once in order to exercise visitation and this translated into a fear by Nicole that she would be taken away by Mother. The child described to the Court an argument that had occurred when she was five or six years old. According to Nicole, she went to dinner with Mother either after the argument or just before it and, after the argument, Mother came with a police officer when Nicole got off the school bus. This scared Nicole. Because Susan had a daycare nearby, Nicole, her sister and one or two daycare children ran home and hid on the side of the house. As described by the child, she worried that the police officer would shoot Father and she was not sure what was going on. Eventually, Mother

left and, according to Nicole, "that was it". As Nicole explained to the Judge, she eventually became worried that Mother may take her to an airport and fly her out of the country and that she would, therefore, never see Susan, her Father or her sister [1] again. This incident was a primary focus for Nicole during her first interview with the Court.

### STATUTORY ANALYSIS

Pursuant to 13 *Del.C.* § 722(a),[2] the Court finds that it is in the child's best interest that Father have sole custody and that there be visitation with Mother in accordance with the Amended Visitation Order issued on August 24, 2001 for the following reasons:

### 1. *Wishes of the parents.*

This factor favors primary residence with Father since both parents agree on that issue. This factor, however, is not dispositive of the question of whether there should be sole custody for Father or visitation for Mother. In the last two matters, the parties disagree. As previously stated, Father wishes sole custody and no visitation with Mother.[3] Mother wishes custody with her and, in the alternative, visitation.

### 2. **Wishes of the child.**

This factor favors granting Father sole custody and would, on its face, also favor the cessation of visitation with Mother.

Nicole refers to her biological mother as "Karen" and to her stepmother as "Mom". As Nicole explained to the Court, she is fine with the way her life is now and wants to move to Florida with her "parents". She noted that she likes horses and that she knows that they breed horses in Florida. Moreover, she is worried that any visitation schedule ordered by the Court would stop the family from moving to Florida.

After some supervised visits at the Visitation Center, Nicole explained that she would rather not see Mother but, if it has to happen, she could accept two weeks in Delaware during the summer and some time during Easter and Christmas in Delaware. She was not able to say how she felt about staying in Mother's home because she had not been there for six years. She stated that she was not sure, but in response to the Court's question, she explained that, if she had to leave Mother's house in an emergency because something came up, she could always call and go to

---

1. Nicole calls her stepsister, Susan's daughter, "sister".

2. 13 *Del.C.* § 722(a) requires that the Court determine the child's best interest according to the following:
   (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;
   (2) The wishes of the child as to his or her custodian(s) and residential arrangements;
   (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
   (4) The child's adjustment to his or her home, school and community;
   (5) The mental and physical health of all individuals involved;
   (6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this Title.
   (7) Evidence of domestic violence as provided for in Chapter 7A of this title.

3. Father softened his position in that he filed a January 2, 2001 proposed order which contemplated overnight visitation with Mother and even Delaware visits with her lasting several days after Father's contemplated relocation to Florida.

the home of the paternal grandmother, Joanne W.

Nicole also explained that she has horseback riding lessons between 9:30 and 11:30 or noontime on Saturday morning and that the tentative move to Florida is on June 2, 2002. Although Nicole also helps at the stables, there is no specific schedule for that activity. The Court took into account Nicole's horseback riding lessons and the progress made in her attitude towards Mother as a result of the supervised visits when it implemented the Amended Order noted previously. It is evident to the Court that, while Father should have primary residence and sole custody, it is important for Nicole to have access to Mother and experience her as she is today, not as Nicole remembers her from when Nicole was approximately seven years old and in dire fear of the domestic violence that was present in Mother's home at that time. As noted below, Mother has made substantial progress since those days.

### 3. Interaction and interrelationships of the child.

This factor favors sole custody to Father. Nicole described being worried that she would never see her sister again if Mother came to get her and flew her out of the country. Nicole was referring to Susan's fourteen-year-old daughter, Elizabeth, who lives in Father's home. In contrast, Nicole was aware that Mother had one child with her boyfriend, Glenn M.M., and that the child's name was Marilyn. During the first interview with the Court, Nicole described that, at first, she was interested in meeting Marilyn but that she was no longer interested in doing that.

Marilyn and the maternal grandmother have participated in the visits at the Visitation Center. Therefore, Nicole has more

information regarding her half sister now. According to Pamela D., Nicole and Marilyn got along "well" during the visits and the maternal grandmother's participation was "very good". In Ms. D's words, she does not see many visits that are "this appropriate".

### 4. The child's adjustment to home, school and community.

This factor favors Father. Nicole has been with him her entire life.

### 5. Mental and physical health of all individuals involved.

This factor favors Father. Although Father admitted that he had a drug and alcohol problem which ended about ten or eleven years ago, it does not appear that Father has that problem at the present time. On the contrary, he and the family have been involved in a church program.

Mother also had an alcohol abuse problem. Her sister Colleen remembers Mother being drunk when Colleen was sixteen years old, approximately ten years ago. Colleen indicated that Mother has been active in Alcoholics Anonymous (AA) for six or seven years and went probably a couple of times a week, if not more. According to Colleen, Mother is not drinking and was not drinking even when she was with Glenn M.M.[4]. Colleen also states that the maternal grandmother was diagnosed years ago as being bipolar but that she has been fine and is not on treatment or medications currently. .

### 6. Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title.

This factor favors neither parent. Section 701(a)of Title 13 contemplates that

---

**4.** Colleen, however, also reports that Mother used marijuana and other drugs and needed

psychiatric treatment when she was with Mr. Murdock in the early nineties.

both parents have equal powers and duties with respect to the child. While Father has provided a home for Nicole, he has failed to acknowledge Mother's exemplary progress and has not encouraged a healthy mother/daughter relationship.

### 7. *Evidence of domestic violence as provided for in Chapter 7A of this title.*

This factor favors Father. However, even when Mother was in the midst of the relationship with Mr. M.M., she protected Nicole and called Father when Nicole asked her to do so. In addition, Mother has changed her life and, as reported by Colleen M., broke up with Mr. M.M. about four years ago. In that regard, it is noteworthy that Mother has turned her life around in recent years. She graduated with high honors after putting herself through school and is gainfully employed.

### MODEL RELOCATION ACT

■ Although the Model Relocation Act has not been passed by the Delaware legislature, the court finds it instructive and concludes that an analysis under the Act reinforces the Court's finding pursuant to 13 *Del.C.* § 722(a) that Father may relocate as long as contact and visits with Mother are ensured after the relocation.

### 1. *The nature, quality, extent of involvement and duration of relationship of the child with each parent.*

This factors the relocation. Nicole has had a good relationship and has been regularly involved with Father but her relationship with Mother has improved since the start of the supervised visits.

### 2. *The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.*

This factor favors relocation as long as contact with Mother is not severed.

### 3. *The feasibility of preserving the child's relationship with a non-custodial parent.*

This factor is troublesome. Father's prior history causes great concern to the Court. For that reason, this factor militates against permitting the relocation.

### 4. *The child's preference, considering age and maturity level.*

This factor is persuasive. Nicole prefers to move to Florida.

### 5. *Whether there is an established pattern of the person seeking relocation either to promote or thwart the child's relation with the other parent.*

This factor is a major concern. Father has not promoted Nicole's relation with Mother and has, instead, presented obstacles to such a relationship. For that reason, Father is permitted to relocate subject to implementation of the telephone access between Mother and Nicole and to the regular Delaware visits contained in the August 24, 2001 Order. The Court retains continuing jurisdiction over said Order to ensure its enforcement, and implement any amendments, if necessary.

### 6. *Whether the relocation of the child will enhance the general quality of life for both the party seeking the relocation and the child, including but not limited to financial, emotional, or educational opportunity (including cultural opportunities and access to extended family).*

This factor is not dispositive. Other than the greater ability to be outdoors due to better weather, the only information was Nicole's assessment that they breed horses in Florida.

### 7. *The reasons for seeking relocation.*

Father asserts that, due to problems with his hip, the family would do better in

Florida where the weather is warmer. While this is a legitimate consideration, the Court is still concerned that another major reason may be Father's and Susan's concerted effort to keep Nicole and her mother apart.

After evaluating the Model Relocation Act factors, the Court concludes that they favor the move except for Factors 3, 5 and 7. The Court permits the relocation despite the concerns which are noted under those factors. However, as previously noted, the relocation is subject to the smooth implementation of telephone contact and regular visits as set forth in the August 24, 2001 Order. In the event that the parties do not cooperate in that regard, the Court may need to reconsider whether Nicole should be permitted to remain in Florida. While Father expects the Court to understand that his history of substance abuse is behind him, he is not willing to give Mother the same benefit of the doubt, despite her exemplary progress since 1995.

**IT IS SO ORDERED.**